# DEFENDANT'S EXHIBIT 3

**DEFENSE CONTRACT MANAGEMENT AGENCY** RECEIVED-DCMDE-CSE
6350 WALKER LANE, SUITE 300
ALEXANDRIA, VIRGINIA 22310-3241

EEO OFFICE

CM MAR 26 PM 1: 59

IN REPLY
REFER TO DCMA-DSO

March 9, 2004

Mr. Charles N. Reese
Reese & Reese
Attorneys At Law
1 Old Towne Square
Post Office Drawer 250
Daleville, AL  36322

Dear Mr. Reese:

Enclosed is the final decision of the Defense Contract Management Agency on case number XL-01-018, the complaint of employment discrimination filed by your client, Ms. Barbara A. Planck, on January 12, 2001.

Ms. Planck has the right to appeal this decision if she does not agree with it. The procedures and requirements for appeals are set forth at pages 12, 13 and 14 of the decision.

Sincerely,

CHARLES J. MILLER
Director, Equal Employment Opportunity

Enclosures

cc:
DCMA-G
DCMAE-CSE
DCMAE-GC

FINAL DECISION

OF THE

DEFENSE CONTRACT MANAGEMENT AGENCY

IN THE COMPLAINT OF

MS. BARARA A. PLANCK

(XL-01-018)

I.   INTRODUCTION.

This is the final decision of the Defense Contract Management Agency (DCMA) in the above captioned complaint of discrimination and is issued in accordance with Title 29 of the Code of Federal Regulations (C.F.R.) § 1614.110.

II.   BACKGROUND AND ISSUES

A.   At some times material to the events surrounding this complaint, Ms. Planck was employed by the Defense Contract Management District East (DCMDE), then a subordinate organization under the Defense Contract Management Command, a component command of the Defense Logistics Agency.   Effective March 27, 2000, the Defense Contract Management Command was established as the DCMA.   DCMA is no longer affiliated with the Defense Logistics Agency.

B.   The complaint was filed April 26, 2001.   After an exchange of clarifying correspondence, the complaint was, by letter dated August 6, 2001, accepted in part and rejected in part.   The issues accepted for investigation were:

1.   Whether or not complainant was illegally discriminated against because of her race (Caucasian), color (White), age (date of birth: January 9, 1954), sex (female) and/or reprisal for prior protected activity when:

a.   During the period prior to June 1999, DCMDE did not provide [complainant] relocation counseling.

b.   On November 9, 1999, the DCMDE District Counsel's Office denied [complainant] payment for relocation assistance provided by a private relocation assistance person.

c.   On May 26, 2000 [complainant was] notified by DFAS that a Relocation Income Tax Allowance (RITA) of $4,576.18 was applied to [her] amount of indebtedness.

d.   On October 5, 2000 [complainant was] denied benefits and reimbursement pursuant to the Relocation Assistance Program by the Director of Human Resources, DCMDE, consisting of the following: reimbursement of [privately owned vehicle] POV mileage amounting to $3,348.00, reimbursement of lodging costs amounting to $1,718.74, and reimbursement of laundry expenses amounting to $325.44.

e.   During the approximate period March 2000 until May 2001, DCMDE did not process [complainant's] voucher for reimbursement of car repairs, nor did DCMDE provide information as to how to obtain reimbursement.

f.   During the approximate period March 1999-May 2001, DCMDE did not assist with relocating [complainant] to her husband's work area.

B.   The following allegations were dismissed for failure to state a claim:

a.   In April 1999, [complainant's] husband was forced by his supervisor to take annual leave for a house-hunting trip, and in approximately November 1999 he was denied reimbursement by his supervisor for the leave taken.

b.   In November 1999, the DCMDE Human Resouces Office denied complainant's husband reimbursement for travel expenses when he was reassigned from Lima, OH to Anniston, AL.

c.   During the approximate period March 1999-May 2001, DCMDE did not assist with relocating [complainant's] husband to [complainant's] work area.

C.   An independent contractor investigated the allegations and submitted a report of investigation (ROI).   The ROI was transmitted to complainant's attorney and, by letter dated October 2, 2002, "a final agency decision from DCMA" was requested.   The case is before DCMA for a final agency decision based on the record pursuant to 29 C.F.R. § 1614.110(b).

III.   LEGAL STANDARDS.

A.   Discrimination in employment against persons because of their race, national origin, color, and/or sex is prohibited by Title VII of the Civil Rights Act of

1964, as amended (Title VII).  Discrimination in employment against persons 40 years of age and older is prohibited by the Age Discrimination in Employment Act of 1967, as amended (ADEA).

B.  The U. S. Supreme Court has provided a systematic approach for analyzing complaints alleging discrimination in employment.  Under the Supreme Court's analytical framework, the Complainant has the initial burden of establishing a prima facie case; that is, the production of a body of evidence such that if it were not rebutted, the trier of fact could conclude that unlawful discrimination occurred.  If a prima facie case is established, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action.  If the employer meets its burden, the burden shifts back to the Complainant to demonstrate that the articulated reason is pretext, masking illegal discrimination.  McDonnell Douglas Corp. v. Green, 411 U. S. 792 (1973); Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1982). The Complainant has the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against him.  Burdine, 450 U. S. at 253, 256; St. Mary's Honor Center v. Hicks, 509 U.S. 502, 508 (1993). Although this analysis was developed in the context of Title VII of the Civil Rights Act of 1964, as amended, it is equally applicable to claims brought under the ADEA.  Loeb v. Textron, Inc., 600 F.2d 1003 (1st Cir., 1979), and the Rehabilitation Act.

C.  In the McDonnell Douglas case, the U. S. Supreme Court recognized that factual situations will necessarily vary from case to case and, accordingly, the requirements for establishing a prima facie case will also vary.  McDonnell Douglas Corp., 411 U. S. at 802 (footnote 1).  To establish a prima facie case of discrimination in this case, the Complainant must show that: (1) She is a member of the protected group(s) alleged, (2) She was treated in some adverse manner in connection with the terms and conditions of her employment; and, (3) Similarly situated individuals, not in her protected group(s) were treated more favorably.

D.  In order to establish a prima facie case of discrimination based on reprisal, the record must show:  (1) Complainant engaged in prior protected activity; (2) An official named in the complaint was aware of that activity; (3) Complainant was disadvantaged by an action subsequent to or contemporaneous with such opposition and participation; and (4) The protected activity and the adverse action were sufficiently close in time to permit an inference of a retaliatory motive.  Hochstadt v. Worcester Foundation for Experimental Biology, Inc., 425 F. Supp. 318, 324 (D. Mass), aff'd, 545 F.2d 222 (1st Cir. 1976).

IV.  ANALYSIS AND FINDINGS.

A.  Prior to March 1999, complainant was employed with DCMDE as an Environmental Technician, GS-0029-06, duty stationed in Lima, Ohio.  In March

1999, due to concerns over staff reductions at the Lima work location and to facilitate taking care of her mother who was then in declining health, ROI at exhibit 4, her attorney's letter dated July 17, 2001, complainant requested and accepted a voluntary reassignment to a Management Assistant position, GS-0344-06, duty stationed in Dothan, Alabama, ROI exhibit 9. Complainant was issued permanent change of station (PCS) orders dated March 23, 1999. She physically moved to her new position and duty site on June 1, 1999. She was employed in one or the other of these positions at all times material to the events giving rise to the issues in this complaint.

B. Issue 1a. Complainant argues that she was discriminated against on the basis of sex (female) because she was not initially contacted or provided information (by the Agency, i.e. DCMDE) on the relocation program whereas a male former co-worker received an e-mail message dated February 17, 1999 concerning the availability of the program, ROI exhibit 9, first attachment. That e-mail identified the website for employees to access information concerning a PCS move and also provided the contact information for the agency's Relocation Assistance Program at its headquarters. It appears from the addressees that the February 17, 1999 e-mail message was also sent to other males and females. Upon learning of the availability of the relocation program in mid-April 1999, complainant did obtain and review a copy of the Relocation Package, ROI exhibits 9 and 15. Complainant states that, before her move, she attempted to contact and left messages for the agency's relocation advisor. Complainant asserts that she spoke with the advisor in May 1999 when she was having problems with the movers but the advisor told her that there was nothing more that the advisor could do, ROI exhibit 8. There is no evidence or testimony that complainant requested any additional relocation counseling by the agency. The advisor provided an affidavit for the record, ROI exhibit 12, in which she states that she had no knowledge of any effort by complainant to seek relocation assistance at or before the time she was moving. Complainant furnished specific details of conversations and copies of emails that support the conclusion that she had attempted to contact the advisor and indeed spoke with her at some time during her PCS. The advisor asserts in her affidavit that it is the employee's responsibility to seek out assistance relative to their move.

C. Complainant points to DoD Instruction 1338.19, section 3, containing DoD policy that Relocation Assistance Programs be established to provide information and services to employees on their PCS moves. That instruction assigns responsibility for ensuring that DoD personnel be informed of relocation services (paragraph 4.3.4), however, it also states that DoD personnel have primary responsibility for the welfare of their families (paragraph 3.4). The instruction states that it, "does not establish any rights or remedies and may not be relied on by any person, organization, or other entity in an administrative or judicial proceeding or any other forum." DCMAE's PCS expert at that time gave a statement for the record, ROI exhibit 11, that the Department of Defense, Human Resources Operation Center (HROC), a DLA component providing

- 4 -

services to DCMC, was responsible for notifying employees of the availability of the program.

D.  Complainant is white caucasian female, and she was within the ADEA protected age group, over 40 years of age at the time of the alleged adverse treatment.  Accordingly, she is a member of protected groups.  The record has, however, failed to establish a prima facie case of disparate treatment based on race, color, sex and/or age, regarding the PCS counseling.  As noted above, to establish a prima facie case, the record must present a set of facts or circumstances which, if otherwise unexplained or rebutted, would support an inference of discrimination.  Furnco Construction Co. v. Waters, 438 U.S. 567, 576(1978);  O'Connor v. Consolidated Coin Caterers Group, 517 U.S. 368, 116 S.Ct. 1307 (1996).  The U. S. Equal Employment Opportunity Commission (EEOC) has also held that in order to establish a case of disparate treatment there must be some indication that any discrimination was intentional.  Warren v. Veterans Administration, EEOC Document Number 01842192 1540/D1 (1986).  In this case, there is no reason contained in the record for the agency's failure to inform complainant of the availability of the relocation assistance program as was required by the DoD Instruction and as noted by the DCMAE PCS expert.  The evidence simply shows that certain males and females (presumably agency employees) received an e-mail message concerning the availability of the program whereas complainant did not.  There is no explanation of the circumstances under which the e-mail message was sent.  There is no evidence that persons responsible for ensuring the performance of the notification function were aware of the complainant or her status as a member of each or any of the protected groups.  Further, even assuming, arguendo, that a prima facie case were established, the mere failure, without explanation, of the agency to follow its regulation in this instance is not sufficient to support a finding of intent to discriminate.

E. With regard to the allegation that the failure to provide PCS information, or any of the alleged mater, constitute reprisal, Title VII grants protection against reprisal for protect activities, specifically to include employees who participate in the complaint process.  Protection begins with the employee's first participation.  Here the first record of complainant's involvement with a protected activity is EEO counseling in the instant case initiated on September 26, 2000, leading to this formal complaint filed on April 23, 2001.  There is no evidence in the record of complainant having  previously participated in the EEO process or any other protected activity.  Accordingly, we find that the record does not estbalish a prima facie case of reprisal with regard to any of the issues.

F.  Issue 2b.  Complainant asserts that, in late April 1999, since time was running short for her move and she had not successfully contacted the PCS advisor, she sought advice from an (unidentified) former military officer who suggested contacting Ft. Rucker, which in turn advised complainant that she was not eligible for their services but she may wish to seek the services of a private

relocation advisor, ROI exhibit 9. Complainant asserts that she received "home finding assistance" from such an individual. In her claim for reimbursement of PCS real estate purchase expenses, complainant requested reimbursement of a buyer agent fee (50% of the brokerage commission on the purchase of her new home). Reimbursement for that fee was denied by the agency as unallowable under provisions of the Joint Travel Regulations (JTR) governing PCS entitlements. The JTR provides at paragraph C14002 A.I. (concerning Broker's Fees) that, "No such fee or commission is reimbursable in connection with the purchase of a home at the new [permanent duty station] PDS." The Comptroller General confirmed this point in <u>Matter of Harold R. Fine</u>, B-224628 (1988) where the real estate purchaser's "consultant" fees were denied, and in <u>Matter of Paul E. Thompson</u>, B252445 (1993), where the real estate purchaser's "finder's fee" was denied. Complainant was advised of her rights to appeal any claim denial to the GSA Board of Contract Appeals, ROI exhibit 11, but did not appeal.

G. No <u>prima</u> <u>facie</u> case is established. Complainant asserts that she was discriminated against in being denied reimbursement in that "male employees… were offered this service and benefit". However, complainant has not identified for the record any other employees who were granted reimbursement by the Agency of buyer agent fees or brokerage commissions on the purchase of a new home or otherwise provided such services or benefit by the Agency. The record does contain an affidavit, ROI exhibit 13, from the Chief, a white female within the ADEA protected group, of the PCS & Appeals Division, Travel Operations, Columbus, Defense Finance and Accounting Service. That witness' section processed complainant's travel vouchers, and she states that she does not believe any of the employees who handled complainant's vouchers knew of her race, color, or age but could have guessed as to her sex based upon her first name. Complainant's attorney reasons that since she was not provided with relocation assistance by the Agency, the Agency should have hired a (private/commercial) relocation service to assist her. ROI at exhibit 4, letter dated July 17, 2001. Complainant further asserts, ROI exhibit 9, paragraph 53, as an illustration of discrimination, that she was not offered a home buyout option whereas male employees of the agency were offered that option. Complainant names one headquarters employee. In her affidavit, ROI exhibit 11, the involved DCMAE Employee Relations Specialist describes the controlling processes and states that, "…as a District, we have not offered the Home Buyout option to any of our employees." This is confirmed in the affidavit of the DCMAE Human Resources Director, ROI exhibit 10, who explains that the Home Buyout option was subject to specific economic criteria such as closure of an entire facility that had not occurred to date within DCMAE. In that complainant has not identified any other similarly situated DCMAE employees who were granted benefits not afforded to her, and that there is no reason to believe any party was aware of her race, color or age at the time of their participation in processing any portion of the action, no <u>prima</u> <u>facie</u> case of discrimination is established concerning this issue. Assuming, <u>arguendo</u> that a <u>prima</u> <u>facie</u> showing were deemed established, the record contains evidence of a legitimate non-discriminatory explanation of the

- 6 -

process and result, which the record does not demonstrate to have been offered merely as a pretext for action actually motivated by complainant's race, color, sex, or age.

H.    Issue 1c.    This issue involves actions of the Defense Finance and Accounting Service (DFAS) rather than DCMA, however, in accordance with Kennedy v. Secretary of Defense, EEOC Document Number 01961247 (1997), claims filed against any section of the Department of Defense are considered as properly filed, and should not be fragmented.    Accordingly that claim is being decided here.

I.    Complainat states, ROI exhibit 9, that, "DFAS took my RITA [relocation income tax allowance] to apply toward the indebtedness I am alleged to owe" and "If fairness and applicable considerations were provided to me this debt would never have occurred", contending that the action represented "unequal" treatment. The essence of complanant's allegation is that collection of the indebtedness was a hardship for her family in the context of their difficult move. In its letter to complainant dated May 26, 2000, DFAS advised Ms. Planck that she was indebted to the Government in the amount of $2,846.27 for unliquidated travel advance payments.    That letter also advised complainant that she may appeal any part of the settlement of her travel claims to the GSA Board of Contract Appeals.    By letter dated June 1, 2000, complainant and the National Federation of Federal Employees requested suspension of collection on the indebtedness.    The Agency honored that request.    Following a settlement certification by the Defense Office of Hearings and Appeals that the Government's claim for unliquidated travel advances may not be considered for waiver under the provisions of 5 U.S.C. 5584, complainant, by letter dated September 20, 2000, requested a repayment schedule of $30 bi-weekly for her indebtedness.    DFAS responded by undated letter, ROI exhibit 13, presumably sent in October 2000, indicating that it would initiate payroll deductions in the amount of $50 bi-weekly.

J.    While complainant asserts that she was discriminated against in the handling of her indebtedness, she has not identified any other employee of a different race, sex, color or age who was treated differently by DCMA or by DFAS.    No evidence has been presented that any persons from the various Government entities who worked on the collection of complainant's indebtedness knew of her race, sex, color or age.    The affidavit of the DFAS manager most involved in the matter of the the indebtedness collection, ROI exhibit 13, states that she does not believe any of her employees knew of complainant's race or age but could have guessed as to her sex based upon her first name. Accordingly, no prima facie case of discrimination has been established concerning this issue.    Assuming, arguendo that a prima facie showing were deemed established, the record contains evidence of a legitimate non-discriminatory explanation of the process and result, which the record does not

- 7 -

demonstrate to have been offered merely as a pretext for action actually motivated by complainant's race, color, sex, or age.

K.  Issue 1d.  In July 2000, complainant submitted a supplemental travel voucher in the amount of $5392.18.  This voucher consisted of her request for reimbursement for 3 items.

L.  The item was lodging/temporary quarters subsistence expense (TQSE) for the period July 22, 1999 to September 21, 1999 in the amount of $1718.74. This item, which had been denied by DFAS on a previous voucher, represented mortgage and utility costs for the period shown for complainant's permanent residence in Alabama.  Although complainant had been granted an extension of entitlement to payment of TQSE for an additional 60 days following her first 60 days of TQSE in temporary quarters, DFAS denied the expense item on the basis that, "When she (complainant) moved into her permanent residence on July 21, 1999, her entitlement to a temporary quarters allowance ceased," ROI exhibit 11.  Complainant asserts that her permanent residence was "uninhabitable" at that time and presents substantial evidence of its need for major repair.  While she contends that she did not move her family or household goods into the residence, the expense claimed is in fact for the permanent residence, where complainant admits they did in fact reside during that time period, albeit under difficult conditions.  ROI at exhibit 15, affidavit dated 31 May 2002, paragraph 5.

M.  The Department of Defense Joint Travel Regulation (JTR) at paragraph C13200 provides that "TQSE is a discretionary allowance, not an entitlement, that is intended to reimburse employees for reasonable subsistence expenses incurred when they and/or their dependents must occupy temporary quarters.  Paragraph C13110 A states, "Temporary quarters are private or commercial lodgings occupied temporarily after a PCS is authorized."  Paragraph C13200 C3 states that, "Temporary quarters occupancy ends when the employee or any dependent occupies permanent quarters or when the authorized period of time expires, whichever occurs first."  Accordingly, DFAS denied complainant's claim for lodging expense for the period of time following her movement out of temporary quarters and to the property she had purchased as her permanent quarters address. Complainant claims she was discriminated against in being denied reimbursement for the lodging expense and that she was harassed by a DFAS employee and forced to stay in a substandard structure, resulting in complainant receiving unfair and unequal compensation.  After purchasing her new home, Ms. Planck communicated with the DFAS representative concerning an extension to her TQSE entitlement while repairs were made. ROI at exhibits 13 and 15.  Complainant was advised that since she had purchased permanent quarters, the Policy Group would look at the circumstances and determine continued eligibility for TQSE.  Complainant was, in fact, granted an additional 60 days eligibility for TQSE.  However, before that decision was made she had already moved to her permanent residence address,

- 8 -

presumably because of the uncertainty of receiving an extension to TQSE entitlement. Complainant asserts she should have been compensated for occupying substandard housing by receiving reimbursement for the mortgage and utility expenses but does not cite any JTR authority for such an entitlement to an allowance when occupying permanent quarters under the circumstances in this matter.

N.    POV mileage was claimed for the period July 22, 1999 to September 21, 1999 in the amount of $3.348.00, representing three round trips per day from her home to a nearby town for meals. This item was also denied by DFAS on an earlier voucher for the reason that the JTR does not provide entitlement to reimbursement for mileage as an element of TQSE. Complainant asserts, ROI exhibit 15, that the mileage was necessary due to the lack of utilities and appliances and being "misled and coerced into moving into an uninhabitable house." She contends that she should be paid the mileage in compensation for occupying substandard housing. In support of her claim, complainant makes reference to case decisions and Federal Travel Regulation (FTR) provisions permitting reimbursement of mileage expenses while on temporary duty, but these are different from those controlling PCS. The JTR, not the FTR, governs travel and reimbursement of DoD employees, and at paragraph C13215 provides specifically that TQSE is not paid for local transportation expenses.

O.    Reconsideration of laundry expenses for the period June 1, 1999 through July 22, 1999 in the amount of $325.44. Complainant had previously claimed coin laundry expenses for the period during which she was occupying temporary quarters in the amount of $650.89. She was paid only 50% of that amount as DFAS had determined that the amount claimed was excessive. Complainant then requested reconsideration of the remaining $325.44. That was denied by DFAS for the same reason. The JTR provides at paragraph C13215 that TQSE reimbursement is limited to actual expenses providing the expenses are:   a. directly related to temporary quarters occupancy; b. a reasonable amount; and c. substantiated. That paragraph also notes that "The travel approving/directing official may deny reimbursement of any claimed expenses that appear to be unreasonable if the employee cannot justify the expenses." Complainant claims, ROI exhibit 16, that the reduction in reimbursement for coin laundry expenses was unfair and discriminatory in that it constituted disparate treatment, but does not identify on what basis, claiming only that the full amount incurred should have been reimbursed.

P.    With respect to each of the 3 items claimed, mileage, lodging and laundry, complainant was denied reimbursement in accordance with the provisions of the JTR. She was advised in a note dated November 16, 1999, ROI exhibit 1, that she could appeal to the GSA Board of Contract Appeals if her PCS claims were denied. Complainant made no such appeal. Complainant does not identify other employees filing similar claims for these expenses who received different treatment. Accordingly, no prima facie case of discrimination

has been established concerning this issue. Assuming, arguendo that a prima facie showing were deemed established, the record contains evidence of a legitimate non-discriminatory explanation of the process and result, which the record does not demonstrate to have been offered merely as a pretext for action actually motivated by complainant's race, color, sex, or age.

Q.  Issue 1e.  Complainant asserts that in March, 2000 she submitted to the agency her voucher requesting reimbursement of $242.76 for repairs to her POV and rental car expenses for the period of time, June 2 to 4, 1999.  She contends that from approximately March 2000 until May 2001, the agency did not process the voucher and did not provide her with information as to how to obtain reimbursement.  Complainant states, ROI exhibit 9, paragraph 57, that she was provided assistance in this matter via a memo on May 14, 2001.  It is unclear from the record why the voucher was not processed for an extended period of time.  Complainant asserts that it was lost at the Boston office.  By an e-mail dated May 4, 2001, the agency's EEO specialist advised her that "I was called today ... from Fort Devens . She will send the forms and the address for you to send the claim for the POV repairs to the right office." This e-mail suggests that claim was not one which is processed through the complainant's Agency.  In any event, complainant does not identify other employees filing similar claims who received different treatment.  Accordingly, no prima facie case of discrimination has not been established concerning this issue.  Assuming, arguendo that a prima facie showing were deemed established, the record contains evidence of a legitimate non-discriminatory explanation of the process and result, which the record does not demonstrate to have been offered merely as a pretext for action actually motivated by complainant's race, color, sex, or age.

R.  Issue 1f.   The issue accepted in this matter was, "During the approximate period March 1999-May 2001, DCMAE did not assist with relocating [complainant] to her husband's work area."  The record indicates that this allegation was bifurcated into two distinct claims.  First, that she was not given assistance in non-competitive reassignment or transfer to a location closer to the Anniston, Alabama location to which her husband had relocated, and second that she was not selected when she competitively applied for the position of Safety and Occupational Health Specialist, GS-0018-5/7, located at Birmingham, Alabama under Job Opportunity Announcement DCMA-00-1558.

S.  With regard to a noncompetitive action or other similar assistance, we deem that matter to be properly before the Agency.  It is addressed in the affidavit of the DCMAE Director of Human Resources, ROI exhibit 10:

> It is not the policy of this District to establish positions solely to accommodate the desires of employees to be together.  While we recognize the value of the family unit, we feel there should be appropriate work to be performed in order for us to establish or fill a position even for an immediate family member.  When the initial

- 10 -

reassignment of one member of a household is made at the employee's request without any stipulations or agreements before the fact about movement of a spouse, we would not anticipate the expectation that we should establish a position to bring the family back together again.

He explained that while complainant did not mention a position for her husband when she initially requested her reassignment to Dothan, Alabama, as soon as the she and her husband indicated their desire to move to be together the agency, "made every effort to affect such a move based on their desires and organizational needs" and did in fact reassign her husband to a position somewhat closer to Dothan. This is fully consistent with the evidence of record.

T. The record does not present a prima facie claim of disparate treatment based on complainant's sex, age, race or color with respect to the allegation. Complainant contends that the failure of the agency to assist in relocating her to her husband's work area was disparate treatment because the agency had so assisted other couples. She asserts, ROI exhibit 15, that "The practice of the agency was to keep married DCMA couples together." and that "Jobs have been created and a few have even gained promotions from their moves, with assistance from the agency." In her affidavit dated November 14, 2001, ROI exhibit 9, she names three couples she alleges were relocated by the agency together, however, few details are furnished concerning these couples, their positions in the agency and the circumstances of their moves. Viewed in the context of the Agency policy, as articulated above by the DCMAE Director of Human Resources, there was no guarantee of such a placement to anyone, and the fact that some such placements occurred would raise no inference of discrimination of discrimination against complainant. We further note that complainant attempts to establish a prima facie showing of reprisal in this matter by contending that similarly situated couples who have not filed EEO complaints have received the benefit of same area geographic placement. She offers no example and this assertion is unpersuasive given that, as in all of her allegations, the placement assistance was requested, the events occurred, before her first foray into protected activity in the process. Assuming, arguendo that a prima facie showing were deemed established, the record contains evidence of a legitimate non-discriminatory explanation of the process and result, which the record does not demonstrate to have been offered merely as a pretext for action actually motivated by complainant's race, color, sex, or age.

U. The matter of the competitive selection is dismissed as untimely filed. We find that it is not sufficiently like and related to the claim in this complaint to constitute an allegation of a continuing violation. The process under which complainant applied for, and was not selected for, the position in Birmingham, Alabama is wholly unrelated to the matter of her relocation to Dothan, Alabama. While complainant's motivation in applying may have been related, the persons responsible for the selection were entirely distinct. If the matter were deemed to

- 11 -

be before the Agency, we would find that the record does not present a <u>prima</u> <u>facie</u> claim of disparate treatment based on her sex, age, race or color with respect to the identified selection. The record reflects that the selectee for the intern position is female, and otherwise a member of the same protected classes. With regard to the assertion of reprisal, there is no evidence presented that the selecting official was aware at the time of his involvement in the selection process that complainant had participated in any protected activity, ROI exhibit 14. Accordingly, no <u>prima</u> <u>facie</u> case of discrimination has been established concerning the selection. Assuming, <u>arguendo</u> that a <u>prima</u> <u>facie</u> showing were deemed established, the record contains evidence of a legitimate non-discriminatory explanation of the process and result, which the record does not demonstrate to have been offered merely as a pretext for action actually motivated by complainant's race, color, sex, or age.

## V. DECISION.

After a careful review of the entire record in this case, it is the final DCMA decision that Ms. Barbara A. Planck was not discriminated against on the basis of her race, color, national origin, age, and/or sex in connection with the matters alleged, nor was she a victim of reprisal. The allegation concerning the selection for a position in Birmingham, Alabama, is dismissed. We have reviewed the record, affirm the previous dismissal of allegations, and note that these matters would appear to have been untimely even if they had been brought forward at the same time as the accepted allegations, since there is no showing of a timely matter like and related to those allegations. No corrective action is required or authorized. As Ms. Planck is not the prevailing party, she is not entitled to compensatory damages or to recovery of legal fees and costs.

## VI. APPEAL RIGHTS.

A. This is the final action of DCMA on the substantive issues in this complaint, the corrective action relating thereto, and on the question of entitlement to compensatory damages, legal fees, and costs. In accordance with 29 C.F.R. § 1614.401 and 1614.407, this final order may be appealed to EEOC within 30 days of receipt of this final order, or a civil action may be filed in an appropriate U. S. District Court.

B. Appeals to EEOC should be forwarded to:

U. S. Equal Employment Opportunity Commission
Office of Federal Operations
P. O. Box 19848
Washington, D. C. 20036

C. Appeals to EEOC may be filed by mail or personally delivered to the EEOC, Office of Federal Operations, 1801 L Street, NW, Washington, D. C.,

20507, or sent by facsimile [(202)663-7022]. You should use or at least enclose EEOC Form 573, Notice of Appeal/Petition, which is provided herein and you should indicate what matter you are appealing.

D.  If an appeal is filed with EEOC, a copy of the appeal must be furnished to:

HQ Defense Contract Management Agency
Mr. C. Miller,  ATTN: DCMA-DSO
6350 Walker Lane, Suite 300
Alexandria, VA  22310-3241

E.  In or attached to the appeal, the date and method by which service was made on DCMA must be certified.

F.  If no appeal is filed within the 30-day time limit, the appeal will be untimely and may be dismissed by EEOC.

G.  If an appeal is filed with EEOC, any statement or brief in support of the appeal must be submitted to EEOC, with a copy to DCMA, within 30 calendar days of filing the Notice of Appeal.  EEOC Office of Federal Operations will accept briefs or statements in support of an appeal by facsimile transmission [(202) 663-7022] provided they are no more than 10 pages long.

H.  In lieu of an appeal to EEOC, a civil action may be filed in an appropriate U.S. District Court pursuant to 29 C.F.R. § 1614.407 within 90 calendar days of receipt of this final action.

I.  If an appeal to EEOC is filed, a civil action may be filed in an appropriate U.S. District Court within 90 calendar days of receipt of the EEOC's final decision.  A civil action may be filed any time after 180 calendar days of filing an appeal to EEOC if there has been no final decision by EEOC.

J.  If a civil action is filed, and appellant wishes to assert that she does not have or cannot afford to obtain the services of a lawyer, the court may be requested to appoint a lawyer to represent her in connection with the civil action. In such circumstances as the court may deem just, the court may appoint a lawyer and may authorize the commencement of the action without payment of fees, costs, or security.  Any such request must be made within the 90-day time limit for filing suit referenced above and must be submitted in such form and manner as the court may require.

K.  If a civil action is filed, the appropriate department or agency head, as well as his/her official title, must be named.  Failure to name the head of the department or agency and his/her official title may result in the loss of any judicial redress to which the complainant may be entitled.  DCMA is a component of the

- 13 -

Department of Defense (DoD). DoD has determined that the Honorable Donald H. Rumsfeld, Secretary of Defense, shall be named as the defendant in any civil action filed against a DoD component.